Good afternoon, Illinois Appellate Court, 1st District Court is now in session, the 5th Division, the Honorable Justice Mathias DeLore presiding, case number 1-9-2188, Carmen Rivera v. Bank of New York Mellon. Good afternoon everyone, welcome to the Illinois Appellate Court, 1st District, 5th Division. We're going to ask the lawyers who are going to argue today to please introduce themselves and tell us whom you represent, beginning with the appellant. Good afternoon, Justices, my name is James Noonan and I represent the defendants appellants in this matter, and cross appellees. All right, is there anybody who is going to be arguing for the City of Chicago? Yes, Your Honor, Stephen Collins for the City of Chicago. Okay, and do you have an agreement about splitting your time or not? Yes, Your Honor, we would like to split our time 50-50. All right, and who's going to go first? The City will. The City will go first, okay. And who's here for Ms. Rivera? Christopher Tonkins on behalf of Ms. Rivera. All right, thank you. All right, we're going to allow 15 minutes per side. We will allow an additional five minutes for rebuttal at the end. Again, that'll be split evenly if necessary. We may extend the time if we get a lot of questions. So, be aware that we have read the briefs and we're familiar with the facts of the case, so use your limited time to concentrate on your major issues. Mr. Collins, you may proceed when ready. I'm sorry, Your Honor, the City is on the appellee side of the case. Oh, I'm sorry. So when I said the City would go first, I meant between the City and Ms. Rivera. I apologize for the confusion. I'm sorry, that threw me. I assumed the City would not be arguing, so I didn't split it. So, that means Mr. Noonan, it's up to you, right? That's right, Judge. Go ahead. May it please the Court, James Noonan on behalf of the defendant appellants, cross appellees in this matter. And as Justice rightly pointed out, given the limited amount of time and the quality of the briefs, I would like just to focus my comments on four, basically four areas, of course, subject to any questions the Court may have to me. First is, is the question raised at the trial court, whether the Keep Chicago Renting Ordinance, the ordinance at issue in this case, is preempted by the Rent Control Preemption Act. The trial court found that it was, but this brings us to the second question, concluded that the rental rate limitations embedded in the ordinance could be carved out and the ordinance would effectively still serve its intended purpose. We contend, the appellants contend that the trial court got that wrong and that the offending provisions cannot be stripped out of the ordinance without basically eviscerating the entire provision itself. The third issue is, goes to in the event the court finds that the ordinance is not completely preempted, whether the, whether the tenant has any obligations to come forward with evidence of their, to prove or to their status as a qualified tenant. Or put another way, is the landlord owner under a strictly liable to provide the offer to the tenant without the tenant providing that information to the owner. Finally, the last point I'd like to cover in time permitting is the issue of damages, which are set forth in the appellee's brief. And that is very, very simple, is the trial court ruled that the banks were liable for damages, which under the ordinance are twice the amount of the relocation assistance fee. So, two times $10,600 and the appellee believes, contends that the, they're entitled to that plus the relocation assistance fee as part of their damage award. We contend they're not in the trial court was correct. So, on the on the key issue, which I think is a key issue is on whether or not the rent control preemption act. Completely preempts the KCR. Oh, I think it's, it's evident from the language of the statute itself. According to a plain reading of that of that statute, the, the app prohibits any municipal action that seeks to direct or manage or prescribe rules or regulations impacting the affairs of landlords and tenant with respect to how much rent the landlord can charge. We contend that the KCRO does exactly this. If the owner of the property in a following a foreclosure wishes to enter into a lease with a qualified tenant, it cannot charge more than 2% of the tenants current rent. That is a, our contention is a rent control and is prohibited by the preempted by the act. Mr. Newton, your opponents, take the position that the term rent control is a term of art nationally, and that it only refers to a systemic regulation of the entire industry, as opposed to a case by case situation, which is what presents itself in the Chicago ordinance. What is your response to that argument? One is that we reached this issue of, of traditional rent control only where, if we find that the RC, the rent control protection act is ambiguous in any way, and it is plaintiffs position or sorry defendants position that the terms uses regulating control and they are broad, expansive terms, but they are not ambiguous as such. We believe that the court is obliged to rule on the language in the statute. But even if the, even if the, the court were to analyze this under a traditional rent control concept, we believe that the KCRO constitutes rent control for 2 reasons. First, even the definitions that the city and the plaintiff use suggest that, you know, it does it does a cap rents. Does it cap the amount you can charge unquestionably it does 102% of the rent for renewal. Does it apply to a broad class of people. It applies to every building in the city of Chicago, where there's a mortgage and a tenant. We haven't done the analysis on that, but I think the court can take judicial notice of the fact that that includes a lot of people. So the breadth and scope of this ordinance would fall under traditional rent control. The definition advanced by the defendant and the plaintiff in the city in this case. All right, let's let's give you for the sake of argument that the 102% feature of the city ordinance is rent control which is preempted by the state law. Why isn't that provision severable from the rest of the ordinance, because the ordinance has a lot of other things that does such as a registration requirement the $10,000 payment for relocation in a few other things. So, judge. Great. That's a great question. And that's really the second issue I contend is at stake here. And the reason is, is as follows that the test here is whether or not the city council would have passed this piece of this ordinance. Without that rent control limitation place. And to me it's very clear that they wouldn't for the following reasons. One is that. If you remove the rent control you remove the incentive that the city intended to impose upon owners to keep tenants and property at that low rental rate. If the, if the, if the, if the tenant can base if the landlord can basically. If the landlord can raise the rent to whatever amount it wants. With the intention of getting rid of those tenants that the ordinance was intended to protect. It can do so with impunity it doesn't have to pay that relocation assistance fee because presumably the tenants going to reject that offer. And, you know, it's going to get rid of the tenants that the landlord doesn't want in the property, which is exactly what the ordinance wasn't was enacted to prevent. But in addition, the history of the ordinance which is set forth in our brief is very, very clear that the driving force the crux of this ordinance is the rental limitation. So it's not just keeping people in their properties it's keeping people in their properties at current rent or 102% of current rent, which again is a limitation you pull that out of it. All we really are left with are the notice provisions that the landlords obliged to give to tenants, as well as the registration provisions, which I contend, our duties that the landlord is already under pursuant to the foreclosure laws and eviction laws they have to give the tenants notice under section 15 08.5 of the mortgage foreclosure act, and they have to register the property with the municipalities under, under the mortgage foreclosure at all. So, the question then is with the city of council of passes legislation requiring owners to do what they're already obliged to do under the mortgage foreclosure act, we contend that they wouldn't, it would not, it would, it would, it would have been a waste of time what the city was after was limiting and capping rents rent rates for tenants who are threatened to be evicted from their houses following a foreclosure. The, the, the other issue that I think is worth discussing because I think it's an important point brought up by the city and the plaintiff in the lower court. Is this provision is this concept that the rent control protection act effectively has two types of prohibited conduct or or two limitations on the type of conduct that is covered by the act. And the, the, I think the, the fairest reading of the act suggests that that is a, that is not correct. First of all, the section five of the app which is which is captioned rent control prohibited prohibits prohibits a unit of local government from covering it so section five prohibits any unit of local government from acting any from enacting any like rent control legislation. City of Chicago is a unit of local government. So, it is covered by five, but because it's a home rule unit it's a lot of entitled to opt out of it. Unless the legislature has articulated express anti opt out provision and that's what they did at section 10, which is, which is captioned the, the preemption of home rule authority. And in that preemption of authority it's expressly the caption says that this section refers to that purpose, ie the legislative announcement or legislative statement that the city of Chicago or any home real municipality is not entitled to opt out of this. So, again, consistent with the sweeping scope of what the legislature intended to impose when it enacted the CPA. They also intended it to capture everybody, not just not home rule units. But even, even, even so, even if that we take, even if we can see that there are two levels of prohibited conduct here. Look at the language in the scope go back to the language of the other of the rent control Prevention Act. And, you know, see what the language he was they each sex both sections use the word that municipalities and home rule units are prohibited from regulator controlling the amount of rent control control. And if the law regulates and controls rent, it has the effect of controlling. So, whether you know they think the city and plaintiff want to use that the effect of controlling rent is a broader concept and controlling rent, but they're interchangeable. If you're controlling rent you have the defect is the rent has been controlled vice versa. So I think that's a false statement I think it's very clear that section 10 isn't a different differentiation of a different standard, but rather the legislature's express statement that the home rule units are not exempt and cannot doubt from the other issue I'd like to touch on briefly judge is this question of of strict liability and that's what the trial court found that an owner is strictly liable to offer to make the offer to an occupant. I won't even call them tenant because from what the trial court said anybody who claims to have be living in the property and claims to be a qualified tenant would be entitled to these benefits and the owner is subject to liability and administrative fines and penalties. If it doesn't comply with it according to the court. I think that's a misreading of the, of the ordinance, and I think it's certainly a misreading of how the, how the audience was intended to work. The only investigation that the ordinance says the owner must do is to make a good faith effort to determine who lives at the property. And once it does that, then it sends the tenants, those persons notice dictating or detailing the, their rights under the case hero, as well as the tenant information disclosure form. Then the statute says the tenant shall return that form to the owner within 21 days. Once the owner gets that form. And again, the form says not only should we return it because the owner needs this information to determine your eligibility. So it was very clear what the city council was trying to get at here was to get both parties working to make a determination whether whether the tenant is qualified tenant is there and then, then the owner is there for. No, no, no, no, I have to ask you, was it real did you are you really contending that Miss Rivera wasn't a qualified tenant you sent her the notice so obviously somebody did some investigation to determine that this person was a was legitimately It seems from your argument, although you do not say this, that because she didn't have a written lease that was dated with current with a current year that you could consider that she wasn't a qualified tenant I mean you didn't say that but that's what the argument seems to be and she had a lease. She, which set out the terms of how she how the property would be rented and how much rent she would pay and all of that. So, I mean, what is, what is this contention of yours that somehow because she didn't return the form, she wasn't a qualified tenant I, I really don't understand that argument. So, judge, that's a great question and thank you and it's it's a little more complex than that is in so far that our position is not so much that she that that that we're not like that the bank shouldn't be liable because she didn't return the form that she didn't come forward with enough evidence to establish whether she was a qualified tenant. That evidence, what would be the additional evidence that you would need. I believe her attorney did send you a copy of the lease, the only written lease agreement that she had which showed that she was paying $850 a month, and you have that information so what else did you need. Well, one that the lease that was sent to us was not current. So, it was a, what do you mean it wasn't current. So, it had expired, it had expired, a long time, I don't know that expired a long time before that. And it was our position in the trial court that the amount of rent that was that she said she was paying was no longer a fair market rent, and therefore, under the definition of fair market of qualified tenant she wouldn't she wouldn't qualify as a qualified tenant. We contend that as a tenant by sufferance means that by definition you don't have a current agreement. But who determines if she's a tenant by sufferance under Illinois law, if she has a written lease, and the lease expires by its terms, the landlord and the tenant agree over a period of time she becomes a tenant a month to month tenant and that's what that's what she contends and I think the law supports her on that. Judge, I, you know, I, I can see that that she was a month to month tenant. And I guess the question because let me ask you this if she's a legitimate month to month tenant would that be a qualified tenant. If she had a, if she had a rental agreement that was month to month with the current owner, or the owner at the time, then yes. Okay, we had no evidence again we didn't the fact that she sent us a lease that was expired, does not tell us that she has a current agreement with the owner. That lease was expired years ago is it reasonable to believe that she had been attended that sufferance for however many years that was that that defies logic and common sense. Judge, the, the, the, again, it's we're dealing with, you know, so you have the practical effect of the relationship between the prior owner and the tenant, and then we have the new owners obligation under the ordinance and the under the ordinance. It's very clear that we're that the new owner is only obliged to make an offer to a tenant, who is a qualified tenant and that has very specific definitions, and we didn't. I said what the bank did not have all of the information it needed to make that determination. And that's what I think the trial court took the position that it didn't matter what you had, which you're strictly liable you had to make the offer. Mr. Noonan your time is is up, let me see if the panel has any other questions. I have one question in an action under this ordinance. Who bears the burden of proving that the tenant was or was not a qualified tenant. Judge it is it is the, it is the, it is the bank's position the appellant's position that that the tenant must come forward with some proof of proof of that person's tenancy in order for the new owner who remember is a stranger to this property they just the burden of trial judge to me is very clearly the tenant, the tenant has to prove that their title to recover under the ordinance. Okay. Thank you. Any other questions. Mr Noonan. Please give us a very brief but 32nd conclusion, and we'll call you back in a few minutes. Judge very, very briefly I contend that the trial court is an initial assessment that the that the case CRO is completely preempted by or sorry is preempted by the rent control preemption act was correct. I think that I believe and contend that the judges courts, finding that you can peel out the rent control provision and still conclude that the city council would have passed this ordinance without it is incorrect, and I asked that they are. And the other reason stated in our brief judge and the other issues I asked the appellate court, sorry the trial courts decision be reversed. Thank you, counsel I believe Mr Collins is up next for the city of Chicago. You've got seven and a half minutes. Thank you, Your Honor, and may it please the court. I'm going to confine my remarks today to interpretation of the keep Chicago renting ordinance and the rent control preemption. And I'd like to make three points. First, state law does not preempt the ordinance. Second, if the ordinances renewal rate clause is preempted. It's severable from the rest of the ordinance. And third, and owner must comply with the ordinance, even if a tenant does not return the tenant information disclosure form. And finally, with respect to the vagueness issue that the bank is raised. Unless the court has any questions, we rest on our brief. Mr Collins your opponent just told us that the 902% provisions of the ordinance are duplicated by state law, and therefore, that is evidence showing that the ordinance is not severable and should simply fall in as a, as a unit. What is your response to that. I don't believe that's accurate, Your Honor, for one the city's ordinance specifically directs owners of foreclosed rental properties to supply this information to the commissioner of buildings. Moreover, the ordinance specifies that the owner needs to provide the names of the tenants in the foreclosed rental properties and to my knowledge that information is not required by state law. So, in that sense, the ordinances is doing is not just duplicative of the state law. If I may address the preemption issue. State law does not preempt this ordinance. The provision of state law, the state law issue here is the rent control preemption act, and specifically, section 10 of the act, which is the only provision to include express preemption language. Now section 10 preempts ordinances that regulate or control the amount of rent charged properly understood this provision preempts rent control and rent control in turn involves a cap on the amount of rent charge. But that's not what this ordinance does. Why do you define it as a care. Your Honor, because that's that is how rent control is traditionally understood. Well, the question is, is it ambiguous. Well, Your Honor, we submit that it is ambiguous, both because the act does not define those terms regulate or control and at page 11 of our brief we cite cases where courts have found those words to be ambiguous, but even setting aside any potential ambiguity. Section 10 needs to be interpreted alongside section five of the act and section five does not include express preemption language, and it were broadly prohibits enactments that have the effect of controlling the amount of rent charge. Now the General Assembly's choice to use broader language in different language in section five compared to section 10 reflects an intent to prohibit enactments that both directly and indirectly our rent control section 10. By contrast, does not have this have the effect of language, and therefore has a narrower scope. And we submit. Is there anything in the legislative history of this relatively recent legislation that tells us the legislature actually intended to make that kind of a bifurcation. Your Honor, we're not relying. Yeah, we're just relying on the plain language of each section for purposes of our argument that they different words in each section do mean different things. I'm not aware of legislative history on that particular point, but since section 10 does not have this expansive have the effect of language. We submit that it has a narrower scope, and that the right way to give effect to the General Assembly's choice to give section 10 and narrower scope is to interpret it as prohibiting measures that are only only measures that are rent control. Now, the circuit court here decided that the I want to, I want to make clear. Yes, I'm going to read you the language of section 10 a home rule unit may not regulate or control the amount of rent charge for leasing private residential or commercial property. Now is it your contention that the hundred and 2% is neither a regulation or a control of the amount of rent that may be charged. Yes, Your Honor, in a couple of ways. One, the ordinance as a whole, gives owners of foreclosed rental property. This option. One is to offer a tenant the option to renew it no more than a 2% increase over the existing rent or pay relocation assistance to any displaced tenants. Moreover, the ordinance is the Collins isn't the cat that the fact that the, the landlord cannot charge more than 2% over what the tenant is playing paying a regulation of the rent of what rent can be charged. I mean, how else would you describe that. Well, a couple of points, Your Honor, one can open can charge whatever they want. The language is very specific, you cannot charge more than 102% of what the prior years rent was. So how is that not regulation. Well, a couple points, Your Honor. One is that even the bank agrees that the terms regulate and control in this enactment this act are synonymous. And in fact, at page three of their brief, they propose a definition of the word regulate that includes the word control. So I think there's agreement on all sides that these. So you may agree to that. But the statute is phrased in the disjunctive, not in the conjunctive, or does it ever suggest that the word regulate the word control are synonymous says regulate or control. That's true, Your Honor, but it also does not include the more expansive language of section five, which refers to which prohibits enactments that have the effect of controlling the amount of rent charge, and it's our submission that the right way to give effect to the The circuit court decided that the renewal rate clause which is this 2% provision we've been talking about is preempted, but the court's conclusion rested on a faulty premise, because the court believed that this clause quote caps the renewal rate, if the landlord chooses to renew release. But that's not correct, because the ordinance does not impose a cap. Rather, under the ordinance, a landlord and a tenant are free to agree to whatever renewal rate, they want. And for example, an owner may decide it wants to offer a 3% increase and a tenant may well decide that paying 3% more is preferable to the inconvenience of moving under the ordinance that owner and that tenant may agree to those terms. So, the ordinance is therefore it does not impose a cap. It is therefore not rent control, and is not preempted. Now if I may, I'd like to move on to the severability issue. Your time, your time is up so we'll give you about another minute just to wrap up. I appreciate your honor on the severability issue. If the renewal rate clause is severable is preempted is severable from the rest of the ordinance, because there are provisions of the ordinance that have nothing to do with the clause. And moreover, even without the clause, the ordinance would still provide protection to tenants and having the severed ordinance would be preferable to having no ordinance. I have, I'm sorry I have a question. If the hundred and 2% is removed and the landlord decide they want to double the rent, would that still fulfill the purpose of the ordinance. We submitted it would not your honor because even without the renewal rate clause in order we'd still have to give a tenant, the option to renew. And the word option means a real choice. And we submit that if an if an owner offered a rent increase of two or three times the existing rent rate that would be impossible to pay, and therefore would not satisfy the owner's obligation to give the tenant, Collins I think we can agree that one of the underlying purposes of this ordinance was to keep some stability in the rental market in Chicago and allow people to remain in their homes that they rented and thought they were going to be living in. And if you suddenly find that the amount of rent that you are going to be required to pay is three or four times what you thought you were going to pay can we agree that that will probably be a factor that would cause instability across the board. It would cause instability certainly honor and but we submit that even the severed version of the ordinance would offer some protection to tenants and therefore should be allowed to stand. If the renewal rate clause is preempted. I have a question Mr Collins. I don't read the ordinance evidently the way you do. I read the ordinance to suggest that the option they're speaking of is an option for annual rent for the first 12 months. It does not exceed 102%. That's the option they're talking about. You want to carve out 102% leave the word option in. Yes, I believe your honor with if the 2% language were preempted, then what would remain of the ordinance would be a requirement that the owner offer the option to renew or pay relocation assistance. Well, I understand what you're saying, but my difficulty with it is, I think the 102% is part and parcel of the option that must be offered. You want to carve off the 102% and leave the option. The argument can be made that the offending language is an option to renew at 102% not just 102%. Well, your honor, I think, I think that the circuit court's concern was that the 2% the court believe that that provision that language amounted to a limitation on the amount of rent charge. Mr. Collins, if the language of the statute is unambiguous. The circuit court's reasoning is of little import. Our review is de novo. Sure. Yes, your honor. And the question for purposes of severability is whether what remains of the ordinance would still advance the legislative intent of the original enactment and we submit that the severed ordinance here would still do that. Now, I know I'm short on time if I may briefly address the tenant information disclosure form. The ordinance could not be more clear that if a tenant does not return the form in order still must comply with the ordinance section no for OB expressly provides that if a tenant does not return the form in order still must comply with its obligation to either everything that they've been given in requirement of the ordinance. How then is the landlord supposed to know that they're even a bona fide tenant and they're not a squatter and that someone just broke into the property or that they even exist. Yes, your honor there are quite a few options and owner has one, the owner could speak with the previous owner, with whom the tenant had a rental relationship. Second, I know under the ordinance and owner has to serve attendance notice of his or her rights under the ordinance. And when the tenant simply avoid service. It will that happens then there are other avenues as well and owner could hire an investigator to ascertain whether a tenant is a qualified tenant. How difficult it is it for an individual to establish that there are qualified tenant under the terms of this ordinance. Why should this onus be on the landlord. The tenant knows what his or her rental agreements were lease or no lease. They know the amount. They know the term. And so why is it so onerous to place that burden on the tenant who's possessed the information and place it on a landlord was no idea of this information. Yes or no. Well, the choice of who to burden and between the owner and the tenant that is left to city council. No, there's no burden. There's no burden shifting here. Who is the burden on the trial of the cause. You want to put it on the landlord to prove that the tenant is not a qualified tenant, as opposed to placing the burden on the tenant to establish that they are. Any of this if they're not qualified tenants. To be clear, we agree with the bank that in the context of a trial, it would be the tenants burden of proof to prove that she is a qualified tenant. That's not what that's not what happened in this trial. Well, we would to be clear with the city doesn't take a position with respect to the courts ultimate determination, whether Mr Vera was a qualified tenant. Our position is only that in general, when a tenant does not return the form and owner still has to either offer the option to renew or pay relocation assistance to that tenant. So under that under that hypothetical. All right. If in fact, the tenant is a squatter the tenant actually you know there's no way in, in the universe this tenant is going to be a qualified tenant. The fact that the landlord declined or refused or neglected to give the notice is itself a violation of the ordinance and subjects the landlord to the penalties and strictures of the ordinance. Is that the city's position. Yes, that would be correct to. Okay. If there are no further questions then I asked that the court determined that the ordinance is not preempted, but otherwise we asked that the judgment of the circuit court be affirmed. Thank you. Thank you, Mr Tompkins you're up we're going to give you your full half time so that's about seven or eight minutes. So, please proceed when ready. Thank you very much, Your Honor may it please the court. My name is Chris Tompkins I'm appearing on behalf of Miss Rivera in this matter. I will will spend most of my argument I think focused on some of the issues not dealing with preemption and severability but I just want to comment on preemption and severability for a moment. With respect to preemption, I want to be clear. Our position is that the KCRO does not require the landlord. The bank in this case to offer a renewal at any particular rate. They are perfectly free to offer a renewal at 102%, 103% or 200%. The only result of that is that under the ordinance, they then are liable to pay the relocation assistance fee. The language of 050A1 is clear that the renewal rate clause is only an exception to the obligation to pay the relocation assistance fee. And so if a landlord decides if the bank decides that they wish to offer a renewal at some rate greater than 102%, they're perfectly free to do that. And therefore, this is not rent control. Let me let me stop you there. Is it your suggestion that if a landlord is faced with renewal lease at 102% or pay $10,600 or whatever it is, is not a form of regulation of rent? They still have a choice to make and they can elect the option to offer to renew at a higher rate. Certainly, there is some coercion here, but they are not. Non-coercion? That's putting it mildly. Furthermore, I would note that many of the banks are treating this ordinance just like the defendant here. They signal from the outset that they did not even intend to offer a renewal at all. In fact, serve a notice of intent to file a forcible entry and detainer action. At the same time, it filed its KCRO notice. So I think that in particular goes to this issue of severability. I think we cannot assume, as the bank argues here, that even with the offending language removed, if it's preempted, that in all cases, landlords would still not be faced with a choice but to comply with the ordinance. This bank here was clear from the outset that they wanted this property cleared and therefore would be liable to pay the relocation assistance fee. But whether an ordinance is or is not preempted is not a single case inquiry. It's a question of whether this language in the ordinance is preempted by a state statute that is applicable to home rule units. It's not what this bank did or another bank did or what a bank might do. It's a question of the language of the statute versus the ordinance. And if it is preempted, then in that particular case, the city of Chicago has no power to enact it. Now, is it severable or isn't it? That's a different issue. Well, yes, Your Honor. And going to the severability action, I think, as we stressed in our brief, the ordinance tries to do a number of different things. I think the bank is incorrect when it suggests that the purpose of the ordinance is to force renewal at existing rental rates. I think the purpose of the ordinance is to encourage the banks that are taking over these properties to keep the tenants in the property, regardless of what rate it is. It just so happens that to make sure that the landlords do not engage in the type of behavior that the banks suggest all banks would engage in, it has this limitation. But that's a prophylactic test just to make sure that the banks out there do not do what the Bank of New York Mellon was suggesting they would do in all cases. And I don't think that this court needs to assume that all owners taking over properties after foreclosure are going to act in bad faith and are going to go out and seek to evade this ordinance by offering renewals at 200 percent or something like that. Well, you contended before that all of these banks, the only thing they want to do is get rid of its tenants. So why wouldn't they offer renewals at 150 percent to avoid it if it's severable? I mean, you can't run with the fox and hide with the fox and run with the hounds. It's one or the other. Well, I think I think I think we don't have to assume that all banks will act in the same manner in this case. Here, you know, this bank elected not to renew at all. So I think I think I think painting with a broad brush to suggest that every foreclosing bank is going to operate in the same manner and not try to comply with the ordinance. Plus, there would be no effect to encourage these banks to offer renewal. The ordinance, as it stands, even without the right clause, would still encourage banks out there to offer renewals. Mr. Tompkins, let me let me quote you something from from the ordinance. You know, the trigger clause in the ordinance, the pivot of the whole thing is, is that the tenant, quote, has H.A.S. as a bona fide rental agreement to occupy the rental unit as the tenant's principal residence. Close quote that section 514 020. All right. Now, in this case, your client had a lease that with the original landlord, Mr. Christoph, or rather, Mr. Adamski, that expired August 31 of 2010. The deed to the Bank of New York did not issue until December 9 of 2015. So when the Bank of New York came into title, thereby triggering the potential coverage of of the of the KT ordinance. All right. The lease had been expired for one year. I'm sorry, five years and four months. All right. Now, I think we all agree that in the litigation before us, Ms. Rivera had the burden of going forward to show that she was within the class of persons covered by the ordinance. Is it your position that the fact that she had a five year old expired lease was sufficient to show that she was a fell within the class of the ordinance and why? Yes, definitely. I mean, I think the law that we cite in our brief is clear that even when you have a written lease that expires, if the tenant continues to pay rent and the landlord continues to accept rent, you either have a holdover tenancy or a month to month tenancy. What does the record reveal about her payment of rent during that five year period? At summary judgment, she put in two affidavits. Both affidavits made clear that she, after the expiration of the written lease, continued to make rent payments on a monthly basis and continued to do so through the time that the bank became the owner. In fact, I think in particular, her supplemental affidavit made that quite clear on summary judgment. I would also say that the bank here did not provide any contrary evidence. And in fact, on summary judgment, put in Ms. Rivera's deposition testimony, which also made the same point. And in fact, took Ms. Rivera through a litany of testimony and exhibits demonstrating that she continued to pay rent on a monthly basis, even after the expiration of that lease. And that, again, focuses back to my question. The ordinance uses the word agreement. Who are the parties to that agreement after December 9, 2015? One is Ms. Rivera, who's the other one? Well, I think after the date of the confirmation of the foreclosure sale, I think under the Illinois Mortgage Foreclosure Act, the bank still is liable for a period of time under that lease. In fact, under the IMFL, if they're a bona fide tenant, I believe that the landlord needs to let that lease run to its end of its term. But it didn't have a term because she's a tenant at sufferance, isn't she? When does that term expire? She's not a tenant at sufferance. A tenant at sufferance is only the situation in which the tenant holds over, maintains possession, but the landlord takes some action to clearly reflect that they didn't want that leasehold to continue. So this is not a tenancy at sufferance. So under your analysis then, under the Foreclosure Act's provision allowing the lease to run its national course rather than be extinguished, when did her term of occupancy expire? She had a month-to-month tenancy, which means that to end that tenancy, the landlord, which became the bank, would need to provide the appropriate notice. I believe under the Illinois Mortgage Foreclosure Act, there's a 90-day requirement for a month-to-month tenancy. So either under the Chicago Residential Landlord Tenant Ordinance or under the IMFL, the landlord still needs to provide notice that they're going to terminate that month-to-month tenancy. And absent providing that notice, that month-to-month tenancy will continue month-to-month until they provide that notice. Does a month-to-month tenancy have an annual rental rate? I believe the case law indicates that the month-to-month or holdover tenancy both continue according to the terms of the original written lease that existed. So the original written lease specified $850 a month in rent, and those terms would continue on a month-to-month basis after that written lease expired. That wasn't my question. Does a month-to-month tenancy have an annual rental rate or only a monthly rental rate? It certainly would have a monthly rental rate. You know, I think the focus of the KCRO would be given the fact that the owner, the new owner, needs to continue to comply with the KCRO until such time as they sell the property to another purchaser. They, in effect, would have to continue to offer renewal of that lease unless they elected to say we're terminating and we're going to pay you the relocation assistance fee. First of all, in this case, there was no lease. There was a month-to-month tenancy is what you've argued. And I noticed that the language of this ordinance says that it's 102% of a qualified tenant's current annual rental rate. I don't think a month-to-month tenancy has an annual rental rate. Well, I mean, given the lease could potentially be terminated upon less than a year's notice, technically, it doesn't have an annual rental rate as such. That said, however, if that lease continued for a 12-month period, it would continue at $875 per month for the entire year. I don't know if the KCRO is making a distinction. I think there may be other circumstances in which tenants have written leases that are still covered by the KCRO, but they don't extend for another full year. I mean, sometimes there's six-month leases. Sometimes there's longer leases as well. Mr. Tompkins, your time expired a little while ago. Let me pull the panel and see if there are any other questions. If not, Mr. Tompkins, a very brief conclusion, please. Your Honor, as we set forth in our brief, we request that this court affirm the circuit court's determination that the bank here violated the KCRO and was liable for damages. As argued in our cross-appeal, we believe that the circuit court, however, did incorrectly calculate the amount of damages here, and that Ms. Rivera should have been awarded both the relocation fee she was entitled to plus the two times the relocation fee damages specified in 050-F as well. And so for that reason, we would ask the court to affirm the decision that the bank here violated the KCRO, but reverse and remand for recalculation of damages consistent with the position in our brief. Thank you, Mr. Tompkins. The court is aware of the cross-appeal, and in light of the complexity of the case and the number of questions posed, we'll let you rest on that. And we're going to get five more minutes to Mr. Noonan and then conclude the argument at that point. And you can rest on your brief as to the cross-appeal. Mr. Noonan, the floor is yours. Mr. Noonan, your mic is off. You're muted. Take your mic off mute. Sorry about that. I didn't want to disturb you when we were turning the argument. My apologies. So I'd like to address the last argument that the city made with respect to the damage portion very briefly. The city takes the position, and plaintiff did as well, that because the statute, sorry, the ordinance says that the rights, obligations, and remedies are cumulative, that means they can double up on getting the damages that are provided for under the ordinance, as well as the fee that wasn't paid. We contend that is a misreading of the statute. I think the meaning of that term cumulative means that a person with rights under the act isn't limited to the damages under that act, where in a situation like this, the city also has administrative powers to bring, to bear, and there are other remedies, such as the notices under the act. So the cumulative issue isn't to double down on the fee itself, but rather on the fact that recovering damages does not preclude somebody like the city from bringing in administrative action. Now, a couple of points I'd like to take with respect to the preemption issue is that the city takes the position that some actors, and he called them banks, but I want to bear in mind that this ordinance does not apply only to banks, but anybody purchasing property in a foreclosure sale. So it's not just banks, it's any owners of property in a foreclosure sale, that they would act in bad faith by raising the rent. But the question I pose is if you are an investor or a bank buying a property in foreclosure and you want that property vacant, it's your property, why is it bad faith to basically take advantage of your rights under the Illinois Mortgage Foreclosure and Eviction Laws to evict existing tenants? It's not bad faith to want the property back in the shape that you want it in, which is, in some cases, empty. And if you take out the rental limitation, you can do that with impunity. You could offer, as your Honor said, 150% of the rent, and the tenant, of course, is going to refuse that. And under the way that the ordinance would be read in that context, they wouldn't have to pay the 10-6 either. So it's not really just a matter of trying to comply with the act or bad faith actors here. It's really logic. No owner who wants to get rid of tenant and can get rid of a tenant with impunity is going to voluntarily write a check for $10,600. It defies law. I want to address another point that the city made, which is that the ordinance doesn't cap rent because the tenant and the landlord can agree to pay more than 102%, but the landlord would also have to pay a relocation assistance fee. And therefore, it's not rent control. The problems with that argument are really many and manifold, but I think the most obvious one is that the tenant relocation assistance fee, as the ordinance says, is to get the tenant to move. So how could the parties negotiate a new rent and pay them to move? It's illogical and does not hold up under this language of the statute. But in addition, the ordinance doesn't say that. It says there's a choice that a landlord has to make, and it's the landlord's choice. Either pay 10-6 or renew or extend it 102%. There are no other choices available to an owner in that situation. So I think that is an incorrect assessment and reading of the ordinance. And I believe the defendant's position that the ordinance is completely preempted by the Rent Control Preemption Act and the trial court's decision suggesting that the rent control limitation can be severed from the ordinance was erroneous. And I ask that the court's judgment on that and all the remaining issues be reversed. Thank you. Thank you, Mr. Noonan. Thank you to the other counsel for your arguments in the briefs. The court will take the matter under advisement, and you'll hear from us in due course. At this time, court staff will remove everyone from the Zoom chat room except for the panel.